## Allam's Estate.

*Executors and administrators—Right of administrator to finish contract
—Wages.*

An administrator is vested with a sound discretion as to whether or not
he will complete building contracts of an executory character, and if he
acts as a cautious and prudent man would act under similar circumstances,
and in good faith, he will not be surcharged, although the consequence may
be bad.

If the administrator proceeds to complete such contracts, he becomes
personally liable for all debts contracted after the death of the decedent,
with the right of recourse to such estate of the decedent as was embarked
in such business, but such recourse cannot affect the liens of the debts con-
tracted by the decedent in his lifetime.

Where an administrator continues a building contract of a decedent, and
the amount of the decedent's debts at the time of his decease exceeds the
amount to be distributed, the debts contracted by the administrator cannot
be paid out of the fund, and this applies to wages claims as well as to or-
dinary debts.

Argued March 11, 1901. Appeal, No. 122, Jan. T., 1901, by
Charles Weston & Son, from decree of O. C. Northampton Co.,
dismissing exceptions to auditor's report in the estate of John
Stewart Allam, deceased. Before McCollum, C. J., Mitch-
ell, Fell, Brown and Mestrezat, JJ. Affirmed.

Exceptions to auditor's report.

The material portion of the report of H. J. Steel, Esq., au-
ditor, was as follows:

Nearly all the remaining items objected to upon the credit side
of the account raise but a single question, whether the admin-
istrator of an estate, such as this, has the right to complete the
unfinished contracts of the decedent? Under the peculiar facts
of this case this is a question of no little difficulty. The dece-
dent was probably the largest building contractor in the commun-
ity in which he lived. At the time of his death he had in his
employ about sixty men, most of whom were engaged in the
planing mill. As already shown, he had entered into about a
dozen building contracts, all but one of which were in writing
and unfinished at the time of his death. These contracts had

all been commenced and were in various stages of completion at the time of his decease. There was also on hand a large quantity of lumber and mill work partly completed. His estate was largely insolvent, a fact which must have been known to the administrator or could easily have been ascertained by him, for he was the only child of the decedent and familiar with his affairs. He testified as follows:

" Q. In a general way, what did his estate consist of? A. He had a planing mill here in South Bethlehem. Q. Brickyard and other real estate? A. Yes, sir. Q. He had considerable stock of lumber? A. Yes, sir. Q. He had a number of contracts on hand not yet completed? A. Yes, sir. Q. After you took out letters of administration you employed Mr. Brodhead as your counsel? A. Yes, sir. Q. Did you then consider the question whether or not to continue the completion of the contracts? A. Yes, sir. Q. What were you advised by Mr. Brodhead at that time? A. To complete the contracts. Q. In your judgment at that time was it for the interest of the estate to finish the contracts? A. I thought so."

This testimony was not in any way contradicted. It therefore appears that at the time when the completion of these contracts were undertaken the administrator acted under the advice of counsel and what he thought was for the interest of the estate. The work upon the completion of these contracts was commenced immediately after the death of the decedent, about August 26 to November 14, following. On November 5, the administrator addressed a circular to the creditors of the estate, in which he stated that " according to decedent's estimate, and in my opinion, it would be to the benefit of the estate to complete these contracts." The creditors met on November 12, and unanimously concluded to stop the work. Under these circumstances were these unfinished contracts executory and binding upon the estate of the decedent, and did the administrator have the right to complete them?

In Peries v. Aycinena, 3 W. & S. 64, it was held that a suit by an executor to recover compensation for services rendered by the testator in his lifetime as attorney for the defendant and afterwards by the executor as attorney in completing the same business would be sustained. In the course of the opinion Justice ROGERS said: " Is there any authority to show that exec-

utors may not carry on a testator's business ? Or that they shall not go on to complete his contracts to a reasonable extent? Many familiar instances might be suggested in which the half executed work of a testator ought to be finished for the sake of his estate through the medium of his executors." He then cites with approval a number of English authorities upon the subject. In Dickinson v. Calahan's Administrators, 19 Pa. 227, it appeared that one party, a lumber manufacturer, agreed to sell to the other, a lumber merchant, all the lumber to be sawed at his mill during five years, and before that time both parties died. The court held the contract to be personal and dissolved by the death of the parties. In the course of the opinion Justice LOWRIE says: "We are then without any well defined rule of law directly applicable to this case, and are therefore under the necessity of deducing the rule for ourselves. The elements from which this deduction is to be made are the contract itself, the ordinary principles and experience of human conduct, the decisions in analogous cases, and the nature of the office of administrator.

We repeat the question: Does such a contract establish anything more than a personal relation between the parties? This is a mere question of the construction, depending upon the intention of the parties: (Hob. 9; Yelv. 9; Cro. Jac. 282; 1 Bing. 225; 8 Eng. C. L. R. 307), unless the intention be such as the law will not enforce. Is it probable that either party intended to bind his executors or administrators to such a relation? The contract does not say so, and we think it does not mean it; for it would involve the intention that the administrators of the one shall be lumber merchants and those of the other sawyers. The character of the contract demands not such a construction; for each delivery under it is necessarily of complete and independent articles, and each delivery was to be at once a finished work on each side. There may be cases when it is necessary that the executor or administrator shall complete a work already begun by the decedent, and then they may recover in their representative character: 1 Crompt. & Mees. 403; 3 Mees. & W. 350; 2 Mees. & W. 190; 3 W. & S. 72. But here every act of both parties was complete in itself. From the contract itself, and from the ordinary principles of human conduct, we infer that neither party intended the relation to survive."

It will be noticed that the contract here construed did not specifically bind executors or administrators, and each delivery of lumber was of complete and independent articles, and was to be at once a finished work on each side.  Here, however, many of the contracts specifically bound the executors or administrators of the parties and were entire contracts.  They stipulated for the payment of gross sums, and all related to the erection of buildings and furnishing of mill work.  From their nature these contracts were not severable, and must have been intended to survive by the parties.  Another element of deduction mentioned by Justice LOWRIE is " the decisions in analogous cases." In Williams on Executors, *1794, the author summarizes the decisions as follows :

" It must be observed that when the law speaks of executors not carrying on the business of their testator, it means that they are not to buy and sell.   There are many cases when executors not only may, but are bound, to continue the business to a certain extent.   Then if a party contracts for himself and his executors to build a house and dies, the executors must go on or they will be liable in damages for not completing the work. So if a party engages to build a house and dies after having procured all the necessary materials, it should seem that his executors ought to complete the work and not dispose of the materials at a loss to the estate.   Again, if a bookseller undertakes to publish a work in parts and before the completion he dies, a subscriber has a claim upon the estate to complete the work, for otherwise these parts which he has purchased upon the faith of the work being completed are useless.   So if a man makes half a wheelbarrow or half a pair of shoes and dies the executors may complete them, and they are not bound to sacrifice the property of their testator by selling articles in an imperfect state.   So if a deceased died possessed of a manufactory, his executor, it should seem, would be justified in continuing the works for a reasonable time if this would be requisite to selling the manufactory and premises to advantage, and they will not, at least, in equity, be charged with any loss sustained in employing the assets in so continuing the trade if they act bona fide and according to their best judgment."

In Dougherty v. Stephenson, 20 Pa. 210, a case where the plaintiff had agreed with the decedent to permit him to mine

4,000 tons of iron ore at a certain price per ton, and very little ore had been taken out at the time of the decedent's death, BLACK, C. J., said: "We think the executors had a right to determine whether the remainder of the work should be done or not."

While the decisions in this state do not clearly define the distinction between executory contracts of a decedent which survive to his legal representatives and those which do not, yet the rule above recognized seems to be sufficiently clear for the present purposes. All of these contracts were entire, were partly performed at his death, some expressly bound his legal representatives, and from the decisions in analogous cases and the conduct of the parties, it is reasonable to believe they intended the relation to survive.

But the question as to whether or not the administrator shall proceed to complete the contracts is an entirely different one, and necessarily is largely left to his discretion. He is best fitted to judge for himself as to his capacity for the work and his ability to continue it so as to enhance the value of the estate. In doing so he should act with the caution and prudence of a man in the control of his private affairs. It is always much the safer rule for an administrator to immediately convert the assets of the decedent into money. But this is not always practicable nor always to the best interest of the estate. The true rule of action for trustees so situated was thus stated by Master of the Rolls, Romilly, in Collinson v. Lister, 20 Beavan, 356:

"The acts which an executor in the absence of any directions contained in the will can do or ought to do for the purpose of completing or rendering available the contracts or property of the testator, depend so much upon the peculiar circumstances of each case that I find it difficult to state with distinctness any proposition which shall lay down a principle applicable to all cases. Some points, however, are settled; thus it is clear that an executor cannot carry on the trade of the testator, except for the mere purpose of winding it up. But the executor may, and in some cases is bound to, complete contracts entered into by his testator, and the instance of a testator who had contracted to build a house and had died, having provided the materials and half completed the work, was cited and relied on

at the bar (Marshall v. Broadhurst, 1 Cr. & J. 403), as an undoubted instance, where the executor's duty would be to complete the imperfect work. Mr. Toller also in his book on Executors, 487, mentions a case where the testator, carrying on the business of a wine cooper, had left a stock of wines which could not have been advantageously sold unless the executor had purchased other wines for the purpose of refining the old stock, and which act was held not to constitute him a trader, but to have been done in due discharge of his duty as executor. If a testator had advanced money on a mortgage of a property, either originally insufficient to pay the amount or which had become so by some subsequent accident, and the owner of that property (the mortgagor), had applied to the executor for a further advance, stating with truth that the outlay of this further money would render the property sufficient to pay both charges, I know of no case or principle which would preclude an executor from advancing such further sum out of the assets of the testator in order to render the property capable of paying the original mortgage, which without such expenditure would not have been possible; and it would, I think, be dangerous to lay down any rule which would prevent the executor from exercising a bona fide discretion in any such case, or even to charge him with a devastavit in case the result should disappoint his expectations. But if a loss should be the result it appears to me to be a necessary preliminary condition before such advances could be allowed him in taking his accounts that he should have carefully investigated the probabilities of success before he advanced the money of his cestui que trust for any such purpose."

In Garrett v. Noble, 6 Simons, 504, the testator directed his executors, with all convenient speed, after his decease, to call in and convert into money all his personal estate. The executors continued working the mills of the decedent and finished some unexecuted agreements, and upon a bill of surcharge for so doing the vice chancellor said: " The rule of the law is that where trustees bona fide exert themselves to discharge their duty and merely commit an error in judgment, unless there is a plain violation of the trust, they will not be visited severely. The fair exercise of their judgment is a protection to them, although the consequence may be bad. Here, in the first instance,

there was a difficulty, and they set themselves to cope with it
as well as they could." In Derbyshire's Estate, 81 Pa. 18, it
appeared that a shipbuilder contracted to build a vessel, to be
paid for in instalments as the work progressed; the builder
died, payments having been made on her; she was appraised
at the amount which had been paid. The executors having no
funds, the vessel being subject to liens, and there being doubt
as to the title a purchaser would take, with other circumstances
rendering it uncertain whether more than a small amount would
be realized from a sale, under the advice of counsel the exec-
utor delivered the vessel to the persons for whom it was being
built and took credit for the amount of the appraisement in his
account. Upon exceptions to surcharge the executors the Su-
preme Court in a per curiam said: " The insolvency of the
builder, the want of funds to complete the large payments made
by the parties contracting for the vessel, the necessity for con-
tinued control of the shipyard, the responsibility necessarily
incurred by the executor in the undertaking to finish the vessel,
and the uncertainty of price a public sale would bring, all united
to make it a case of great uncertainty and doubt as to what
would be the course to be pursued, which would be for the best
interests of the estate. In this state of the case, the executor
having acted under the advice of counsel, and upon the opinion
and advice of a large number of the creditors of the estate
(which was insolvent), it would be a harsh judgment to visit
the executor with a surcharge, because he had not offered the
unfinished hulk at public sale." See also Bowker's Estate, 5
W. N. C. 493.

Again, it is well settled that in an agreement of co-partner-
ship or a last will and testament a binding direction may be
given to continue the business of partnership of the decedent
after death the same as before. And so much of the dece-
dent's estate as is invested in the business will pass into the
hands of those to whom it is given by the law, clogged by the
liabilities thus placed upon it by its former owner. These
principles are well settled, both in our own state and else-
where : Gratz v. Bayard, 11 S. & R. 41; Laughlin v. Lorenz,
48 Pa. 275; Wilcox v. Derickson, 168 Pa. 331; 17 Am. &
Eng. Ency. of Law, 1134.

If a testator in his last will and testament, or a partner in

his articles of co-partnership can bind his estate for the continuance of his business, it is difficult to see in principle why this cannot be done in an executory contract as well, which is not personal to the decedent, but which could be carried out as well by persons in his employ at the time of his death: Williams on Executors, *1792.

The principle to be deduced from these authorities seems to be that the administrator was vested with a sound discretion as to whether or not he would complete these contracts; and if he acted as a cautious and prudent man would act under similar circumstances and in good faith, he will not be surcharged, although the consequence may be bad. He was a son of the decedent, connected with him in the conduct of the business, and testified that he thought it to the best interest of all to complete these contracts. Some creditors seemed to join in this view at this time. There is no proof of any personal gain to him from his conduct of the business. The one circumstance that gave rise to the greatest feeling against him was the sale of the personal property in September to A. F. Pearson, who was employed by him at the time, and their joint conduct of the business for some time afterwards. This sale took place September 29, and the price bid was but $477, a grossly inadequate sum. Practically the same property was afterwards sold for over $6,000, but there is no affirmative evidence of collusion, and both Pearson and Allam deny it. Upon its face it was an extremely suspicious transaction. The day of sale, however, was rainy and disagreeable, and but fifteen or twenty persons were present. It was duly advertised, all persons were given a fair chance to bid, and Pearson was the highest bidder. In Beeson v. Beeson, 9 Pa. 279, it was held that such a purchase made by the trustee himself through a secret agent was not absolutely void in the absence of actual fraud. At most it would be but constructive fraud which would entitle parties in interest to disaffirm the sale. This some creditors did in a petition to court, and about two months after the sale Allam himself asked the court to set aside the sale, and to this Pearson consented. They both testified that they turned over all property and accounts without any personal gain to themselves, and this same property was afterwards sold at public sale for over $6,000. The property at the time of the

last sale was about the same as that on hand at the time of the decedent's death. Under these circumstances the auditor, from the testimony produced, cannot say the administrator did not act in good faith. In Bowker's Estate, 5 W. N. C. 495, Judge ASHMAN, in a similar case, said: "In determining the bona fides of the executor's conduct one circumstance must not be overlooked. He continued the business of the decedent with the double disadvantage to himself, that whatever of profit might accrue would go to the estate, and that as to losses incurred he would be personally liable to creditors as partner. And this although he carried on the trade avowedly as executor: Labouchere v. Tupper, 11 Moore's P. C. 198. And before committing the estate to any hazard he took the advice of counsel and acted upon it. How far this tended to lessen his liability may be seen in McNair's Appeal, 4 Rawle, 148, and Neff's Appeal and Derbyshire's Appeal, supra.

"It has already been stated that the personal property sold and included in the account was about the same in value as that on hand at the time of the decedent's death. Of course, it was not the same property, for the administrator had used some and purchased others. The fund arising from the sale of this property, however, is about all the account shows in hand for distribution. It therefore becomes a primary question whether or not this fund is liable for debts contracted by the administrator in the completion of the decedent's contracts. This question was so learnedly discussed in a somewhat similar case by the late Vice Chancellor VAN FLEET, in Ferry v. Laible, 27 New Jersey Eq. 148, that but little could be added thereto. He there said: "In support of the objection of want of equity it is said that where a testator directs his executors to continue his business after his death and they contract debts in its prosecution, the primary remedy of creditors is against the executors personally, and they have no remedy against the assets until the personal remedy is exhausted, unless insolvency is alleged. This view seems to have the support of the judgment of Vice Chancellor BACON, in Owen v. Delamere, L. R. 15 Eq. Cas. 139, and he cites the judgment of Lord ELDON in Ex parte Garland, 10 Vesey, 120, as his authority. Lord ELDON's opinion, as I read it, gives no support to this view, but so far as he lays down any rule on the subject of the order of

liability, declares the fund or property embarked in trade primarily answerable. He says: "Creditors whose debts have been contracted after the death of the testator have the whole fund that is embarked in the business, and in addition they have the personal responsibility of the individual with whom they deal. They have something very like a lien upon the estate embarked in the trade." It is manifestly just that so much of his estate as the testator has embarked in the business shall be answerable in some form to the creditors of the business. I think this rule may be fairly deduced from the cases that so much and no more of the testator's assets as he has directed to be employed in the continuance of his business after his death, with the accumulations thereon, shall stand charged in equity with all debts properly contracted in the prosecution of the business: Ex parte Garland, supra; Ex parte Richardson, 3 Madd. 138; Thompson v. Andrews, 1 M. & K. 116; Cutbush v. Cutbush, 1 Beav. 185; McNeillie v. Acton, 4 DeG. M. & G. 744. There can be no doubt that on payment by an executor out of his own funds of a judgment recovered against him personally for a debt properly incurred by him in the business, he would be entitled to reimbursement out of the trust property. It stands pledged, unquestionably, for the ultimate discharge of all debts contracted in its employment according to the will of the testator. Vice Chancellor BACON concedes that by directing a continuance of the trade the testator has created a trust estate which the court will keep separate and apply exclusively to the purposes of the trust: Owen v. Delamere, supra. Why then should creditors who must in any event be paid out of the trust property, whether it be regarded as primarily or secondarily liable, be put to this circuity of action with its delays and useless expense? No reason of policy or convenience was shown for limiting creditors in the first instance to a personal remedy against the executors, and in the absence of a binding authority constraining me to adopt that view, I think the demurrer alleging want of equity should be overruled."

From all this the true rule seems to be that upon the death of a person leaving unfinished building contracts, a planing mill and unworked material on hand, the legal representative of such decedent has a discretion either to complete such con-

tracts or not, as he may deem for the best interest of the estate. In other words, he may exercise his election as to whether he will complete such contracts or not, and if he elects not to do so the business will be wound up in the usual way. If, on the other hand, he concludes to complete such contracts, he becomes personally liable for all debts contracted after the death of the decedent, with the right of recourse to such estate of the decedent as was embarked in such business. " An executor or administrator who carries on his decedent's trade is personally liable for all debts contracted by himself in the management of the concern. If expressly authorized to carry on the trade by the will, or otherwise duly empowered, he has a lien for his reimbursement upon such assets as the will directs to be employed. Out of this right grows an equity of trade creditors to resort to this fund for payment after exhausting the personal representative. But their equity is dependent upon his heir, and unless after paying their debts he could have reimbursed himself from the fund, they have no claim on it:" 7 Am. & Eng. Ency. of Law, 342. The position of an administrator in such cases is a hard one at best. If the business is prosperous he can derive no benefit from it; if it proves disastrous he is personally liable for all loss beyond the value of the assets embarked in the venture. His position is one of pure hazard, which he assumes for the benefit of others without the slightest possibility of advantage to himself: Williams on Executors, *1791; Ferry v. Laible, 27 N. J. Eq. 148.

But while the administrator has the right to reimburse himself from the personal property of the decedent employed in the business, the question here presented is whether this right exists to the exclusion of debts contracted by the decedent in his lifetime? In Pennsylvania, when a person dies all his creditors at once acquire a lien upon all his personal property within the state, and the law commits it to the care of an administrator or executor upon the express trust to give each his due according to law: Horner v. Hasbrouck, 41 Pa. 169. Was then this lien of the general creditors at death subject to be defeated by the election of the administrator to complete these contracts or was their lien superior to any right of reimbursement by the administrator? No authority has been cited upon this question, and the auditor has been unable to find any in

this state.   Upon principle, however, he is of the opinion that debts contracted by the decedent in his lifetime are the superior lien.   These debts are known, or ought to be known, by the administrator to be in existence at the time of the decedent's death, and his election to complete the contracts was made with this knowledge.   His right to reimbursement in this regard is somewhat similar to the right of the heir to inherit personal property, subject to be defeated by those who were his creditors at his death.   This seems to have been the accepted view in the analogous case of a direction in a will to continue the business of the testator.   In Lindley on Partnership, 609, the author says: "The liability of the estate of a deceased partner to persons who become creditors after his decease is subject to its liability to those who were his creditors at his decease.   These last must first be paid, and although, as in such a case as Ex parte Garland, they might not be able to follow the assets of the deceased into the hands of the trustee in bankruptcy, yet in administering the estate of a person whose assets have been employed in trade in pursuance of directions contained in his will, the creditors who have become such since his decease cannot compete with his other creditors."   See also Collyer on Partnership, sec. 633.   The effect of this view will be to exclude from the present distribution all debts contracted by the administrator in the completion of these contracts, for the reason that the claims of creditors in existence at the time of the death of the decedent will much more than consume the fund.   In fact, the amount of these claims in existence when decedent died exceed many times the amount for distribution. This is no doubt a hardship as to the debts contracted by the administrator, but parties dealing in this way are bound to look to his authority, and are held to a knowledge of the limitations which the law places upon him.   Their only remedy is against the administrator, and where as here there is no property against which he can have recourse.

Another question of considerable difficulty arises upon the claims for wages presented by the employees of the administrator in the completion of these contracts.   It is plain that the act of assembly giving preferences against estates of decedents does not apply to these claims.   If any preference exists it must be under the act of 1872 and its supplements.   The act

of May 12, 1891, enlarges the scope of the act of 1872, and provides that all moneys that may be due for any period not exceeding six months preceding the sale or transfer of the property "on account of the death or insolvency of such employer or employers" shall be a lien upon such property. This language has been held to mean an accomplished and not a contemplated event: Brown v. The German-American Title & Trust Co., 174 Pa. 443. The 3d section of the act of 1872, is left undisturbed by subsequent legislation, and provides that "in all cases of the death" of any employer the lien shall extend to every property of such employer: Hartman's Appeal, 107 Pa. 327. It is plain that the preference given by the act only includes persons who, while the employer lived, had a lien upon the property used in his business. After death or insolvency the property is in the custody of the law, and after that period no one is authorized to create a new lien upon it. In Robert's Appeal, 110 Pa. 325, the labor was performed for an assignee for the benefit of creditors under an assignment made after a levy. The court there said: "Whilst these labor claims are, as a class meritorious, and to be favored as far as possible, yet one must not forget that they depend for their validity altogether on the legislative provisions in which they originated. A laborer must bring himself within those provisions or he cannot have a preference over other creditors. Kerbin in his notice to the sheriff claims $300 out of any moneys that can be raised from the sale of the leasehold of Thomas Kerbin on account of work and labor performed for S. M. Reed. How the property of Thomas Kerbin was to be made answerable for the debt of S. M. Reed, the sheriff and those interested, we are not informed. From evidence extra of notice we discover that Reed was the assignee of Kerbin, and that the work set forth in the claims was not done until after the levy on the appellant writ. Thus neither by notice nor by oral testimony is this claim brought within the provisions of the statute. Not by the notice because the work does not appear to have been done for the lessee, but for another person. Not by the evidence, because if Kerbin, the claimant, was employed by the assignee it was the business of the assignee to pay him and charge the amount thus paid in his account as part of the expenses incident to the administration of the trust,

but his liability to the laborer whom he had employed was as much personal as though he had employed him about his own business. It follows that the claim could not be charged over to that part of the assignor's estate which was, previously to the assignment in the possession of the sheriff for the use of the owners of the writs. Neither the debtor nor his assignee could thus charge that property." The claims here presented are for work and labor done after the death of J. S. Allam, contracted for by his administrator in the completion of the contracts mentioned. At the time this labor was performed this property was just as effectually in the custody of the law for distribution as it could have been under levy or assignment. If the language of the act, that the claim must precede death or insolvency is to be given effect, these claims can have no standing.. Again, it would seem to be extremely doubtful whether the completion of unfinished contracts is such a permanent business as is contemplated by the act. Llewellyn's Appeal, 103 Pa. 458; Maurer's Appeal, 3 Pa. Superior Ct. 601.

. The book accounts of the decedent have been the occasion of much difficulty to all concerned in this investigation. As already stated, this was chiefly due to the method of the decedent in charging up the full amount of all contracts as soon as awarded. In the original inventory the total of the book accounts as thus made up was $40,598.33, which was reduced in the supplemental inventory to $21,753.83. The auditor is now asked to charge the accountant with the total amount of these accounts including the building contracts. To this he cannot assent. The building contracts offered in evidence were entire contracts, and unless there was substantial compliance with the terms of the contracts there could have been no recovery: Sticker v. Overpeck, 127 Pa. 446; Gallagher v. Sharpless, 134 Pa. 134. And for failure to comply with the contracts an action for damages would no doubt lie. The administrator undertook to complete these contracts and suffered a very considerable loss in so doing. The creditors must either affirm or disaffirm his acts in so doing. They cannot at the same time repudiate his losses and endeavor to get the benefit of his work in completing the contracts. They have chosen to object to his completion of these contracts, and it having been conclusively shown that they were completed at a loss, it follows that

as entire contracts they possessed no value whatever. These contracts will therefore not be considered either as assets or collectible book accounts. The administrator has been examined with reference to the remaining book accounts, and testified to those collected by him. He says he used due diligence to collect all outstanding accounts, and there is no testimony to impeach his in this regard. In restating the account he will be charged with the amount of the claims so collected. These outstanding collected claims the auditor has extracted from the testimony as best he could, no statement having been furnished by counsel, and includes the book accounts collected after the filing of the account.

The account will therefore be restated, charging the accountant with the amount of the supplemental inventory, and credit will be allowed for the difference between that amount received from sale of personal property and collections of book accounts. All credits for materials purchased or work and labor done after the death of the decedent for the completion of the contracts will be stricken therefrom. Commissions will be allowed the account upon the actual value of the property as shown by the account. See Merkel's Estate, 131 Pa. 584.

*Errors assigned* were in dismissing exceptions to auditor's report.

*Russell C. Stewart,* with him *Harry A. Cyphers,* for appellant, cited: Patton's Est., 2 Parsons, 104; Wilson's App., 4 Pennypacker, 432; Shinn's App., 166 Pa. 121; Steven's App., 189 Pa. 385; Bartol's App., 182 Pa. 407; Gratz v. Bayard, 11 S. & R. 41; Brew v. Hastings, 196 Pa. 222; Ferry v. Laible, 27 N. J. Eq. Rep. 146; Mann v. Wakefield, 11 Pa. Superior Ct. 18.

*R. E. Wright* for J. Gibson McIlvain & Co., appellees.

*W. E. Doster* and *J. Davis Brodhead,* for administrator.

PER CURIAM, May 27, 1901:
The auditor's findings of fact and conclusions of law appear in his report. The exceptions taken to the report were care-

fully examined by the president judge who upon due consideration dismissed the exceptions and affirmed the report. It is at least a fair inference from his inspection of the report and the exceptions filed to it that he failed to discover any error in either of them. His unqualified approval of the report and his dismissal of the exceptions shows that he regarded the work of the auditor as a complete and satisfactory answer to the claim made by the appellant. To this we may add that our examination of the report and the exceptions to it have satisfied us that the auditor's findings of fact were supported by the evidence, and that his conclusions of law were applicable to the facts as found. We therefore affirm the decree on the auditor's report.

Decree affirmed and appeal dismissed at the cost of the appellant.